On 6 November 1997, plaintiff requested that Deputy Commissioner Jones designate Dr. Alan Towne as his treating physician. By Order dated 19 November 1997, plaintiff's request was denied. On 21 January 1998, plaintiff filed a motion with Deputy Commissioner Jones, again seeking to change treating physicians. By order dated 11 February 1998, plaintiff was instructed that Dr. Robert Hanson would be his designated treating physician, and plaintiff was ordered to comply with the treatment that Dr. Hanson deemed necessary. Following review of this case by the Full Commission on 10 June 1998, by Order dated 15 June 1998, the parties were ordered into mediation in an attempt to settle the controversies between them. Mediation proved unsuccessful, and the Commission found it necessary to resolve the matters in this case. In order to do so, on 11 June 1999 the Full Commission ordered plaintiff to submit records from Dr. Hanson so that his compliance with the 11 February 1998 Order of Deputy Commissioner Jones could be determined. These records have now been submitted.
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Jones, the briefs and oral arguments before the Full Commission. The appealing parties have not shown good ground to reconsider the evidence; receive further evidence; or rehear the parties or their representatives. Accordingly, the Full Commission modifies and affirms the Opinion and Award of the Deputy Commissioner.
***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing on 24 February 1997 as:
 STIPULATIONS
1. This is a compensable injury and a Form 21 was approved by the North Carolina Industrial Commission on 11 March 1991.
2. Plaintiff has been paid temporary total disability compensation from 6 November 1990 to the present at a rate of $399.00 per week.
3. Plaintiff's medical records were stipulated into evidence. These records consist of the following: documentation from George Charron, M.D.; documentation from Alan Towne, M.D.; documentation from Norfolk Physical Therapy Center; documentation from Rehabilitation Medicine Consultants; documentation from Riverside Physical Therapy; documentation from Lawrence C. Hyman, M.D.; documentation from M.E. Page, M.D.; and documentation from CRA Managed Care.
4. Documentation relating to the payment of compensation for plaintiff was stipulated into evidence as Stipulated Exhibit Two.
5. Documentation from Hampton General Hospital, documentation from Hampton Rose Gastroenterology, and documentation from Young S. Hong, M.D. were stipulated into evidence as Stipulated Exhibit Three.
***********
Based upon all of the competent evidence adduced from the record, the Full Commission modifies and adopts the findings of fact found by the Deputy Commissioner and finds as follows:
 FINDINGS OF FACT
1. An Industrial Commission Form 21 Agreement for compensation for disability was approved by the North Carolina Industrial Commission on 11 March 1991.
2. On 16 May 1994, former Deputy Commissioner Neill Fuleihan entered an Opinion and Award in this matter.
3. Plaintiff is forty-eight years old, has a ninth grade education, and is literate. Plaintiff began working for defendant-employer as a truck driver in 1978. His job responsibilities included driving to various locations throughout the United States and picking up and delivering loads, such as raw steel and machinery.
4. Plaintiff has been previously employed as a route salesman for Pepsi-Cola, an electrician for Bryant Electrical, and a machine and fork lift operator at Phillips Fiber. Plaintiff has also worked for a cable company and as a farmer and a truck driver.
5. On 4 October 1990, plaintiff sustained a compensable injury to his back when he lifted a tarp to secure a load. Plaintiff has not returned to work from Moss Trucking or any other employment since the time of his injury.
6. Plaintiff initially sought treatment from M. A. Talibi, M.D.
7. Plaintiff next sought treatment from his family physician, Lawrence Hyman, M.D. Dr. Hyman diagnosed a labrosacral strain and found no evidence of disk herniation. Dr. Hyman subsequently prescribed a course of physical therapy.
8. Dr. Hyman referred plaintiff to James F. Allen, a neurosurgeon. Dr. Allen first examined plaintiff on 28 December 1990. Dr. Allen determined that there was a probable lateral disk herniation at L3-L5 and prescribed an epidural steroid injection. Plaintiff showed a significant reduction of his leg pain following the injection.
9. Dr. Allen referred plaintiff to a work hardening program at the Back Care Center.
10. Dr. Allen reexamined plaintiff after the completion of the work hardening program. Dr. Allen concurred with the opinion of the physical therapist that plaintiff could return to light duty work.
11. Plaintiff was examined by Dr. Steven Blasdell, an orthopaedic surgeon, on 7 May 1991. Dr. Blasdell diagnosed a chronic lumbar strain. Dr. Blasdell recommended a B200 evaluation and a comprehensive work hardening program.
12. Beginning 14 May 1991, rehabilitation services were provided to plaintiff through Crawford Health and Rehabilitation.
13. Plaintiff was then seen by Thomas Fithian, an orthopaedic surgeon. Dr. Fithian performed a bone scan which reported to be within the normal limits in the spinal area.
14. In June 1991, Dr. Allen recommended a psychiatric evaluation for plaintiff.
15. On 26 August 1991, plaintiff came under the care of Dr. Paul Krop, an orthopedic surgeon. Dr. Krop diagnosed a TLS sprain/strain syndrome and an underlying DDD and a probable fresh L3-4 or L4-5 disk bulge which were producing plaintiff's symptoms. Dr. Krop recommended that plaintiff not return to truck driving and that he lose a significant amount of weight.
16. On 14 October 1991, plaintiff sought the treatment of Kevin J. Westby, a chiropractor. Dr. Westby reported no improvement of plaintiff's condition after four chiropractic treatments and therapy was discontinued.
17. On 4 November 1991, H.B. Marsteller performed an EMG study. This study indicated no evidence of active cervical or lumbosacrial radiooctomy.
18. On 18 November 1991, plaintiff was examined by Frank Schinco, a neurosurgeon. Dr. Schinco recommended a functional capacity evaluation and work hardening.
19. Plaintiff then entered the Sentara Pain Therapy Center from 9 December to 23 December 1991 for work hardening.
20. Following discharge from Sentara, plaintiff requested to be reexamined by Dr. Krop. Dr. Krop's office arranged an evaluation with his associate, Dr. George Charron, an orthopaedic surgeon. Dr. Charron diagnosed greater and trochanteric bursitis and probable disruption of the L5-S1 disk. Dr. Charron prescribed use of a TENS unit.
21. On 27 January 1992, Dr. Charron recommended plaintiff undergo an L3-4 diskectomy and a left nerve root decompression.
22. On referral plaintiff underwent another physical therapy program at the Peninsula Physical Therapy and Associates beginning in February, 1992.
23. On 2 March 1992, plaintiff was evaluated by Reuben Koehler, Ph.D., based on a recommendation from Dr. Hartz for an MMPI prior to considering surgery for plaintiff.
24. Plaintiff was evaluated by Dr. J. I. Abbott Byrd, III, an orthopaedic surgeon, on 21 May 1992 for further evaluation of the hemangioma. The purpose of this evaluation was to provide a second opinion relating to recommendations made by Dr. Charron. Dr. Byrd diagnosed a chronic lumbar strain and did not recommend surgery.
25. On 1 June 1992, plaintiff returned to Dr. Charron and Dr. Charron did not recommend surgery for plaintiff's complaints of the right knee.
26. Plaintiff sought another opinion from Wesley A. Cook, Jr., M.D., a neurosurgeon at Duke University Medical Center, on 4 August 1992. Dr. Cook diagnosed a lateral disk bulge at the L3-4 on the left and post traumatic low back, thorasic and intrascapulor discomfort.
27. Plaintiff returned to Dr. Griffith on 12 August 1992. Dr. Griffith advised plaintiff that he did not feel that surgery would improve his circumstances.
28. On 15 September 1992, plaintiff was reexamined by Dr. Charron. Dr. Charron did not suggest or recommend an EMG.
29. On 17 September 1992, plaintiff underwent an EMG study. This test shows slight acute deherniation at the L3-L4 innervated muscles and chronic changes manifested by bizarre high frequency of discharges.
30. On 11 November 1992, plaintiff was examined by Dr. Parcells. Dr. Parcells, who is not a surgeon, indicated that an L3-L4 radiculopathy existed.
31. On 7 January 1993, Dr. Charron ordered further testing.
32. On 16 March 1993, plaintiff returned to Dr. Schinco. Dr. Schinco did not recommend surgery but felt it might be reasonable to proceed.
33. On 30 December 1993, Dr. Charron suggested that plaintiff return to Dr. Parcells for evaluation to determine whether or not he suffered from peripheral neuropathy. Dr. Charron recommended evaluation of degenerative muscle process.
34. On 7 February 1994, plaintiff sought an evaluation by Alan Towne, a neurologist, instead of Dr. Parcells. Dr. Towne diagnosed an L3-4 disk disease and a neuralgia paraesthetica.
35. On 27 July 1994, plaintiff advised Dr. Charron that he was seeing a neurosurgeon and advised Dr. Charron that he felt the neurosurgeon would be more likely to offer treatment to relieve his back problems.
36. On 12 September 1994, Dr. Charron advised plaintiff that he could work in any occupation that his pain would permit.
37. On 7 November 1994, plaintiff returned to Dr. Charron. Plaintiff's complaints included a left thigh pain. Dr. Charron prescribed physical therapy.
38. On 10 February 1995, Dr. Charron advised that Mr. Sykes will continue to have pain and that he could not offer Mr. Sykes any modalities. Dr. Charron recommended water aerobics and released Mr. Sykes as needed.
39. On 14 September 1995, Dr. Charron again advised that he had nothing further to offer plaintiff and that he would not recommend further surgery. Dr. Charron released plaintiff to return as needed. Plaintiff returned to Dr. Charron 24 November 1995 complaining of pain. Dr. Charron reiterated that he did not know of anything further that he could do for plaintiff.
40. In November, 1995, Phillip Lawson, CRA Managed Care, Incorporated, was hired by defendants to provide vocational rehabilitation services to plaintiff. Plaintiff declined to meet with Mr. Larson.
41. Betty Hoell subsequently assumed responsibility for Mr. Sykes' claim and initiated contact with plaintiff to set up meetings for him.
42. On 16 January 1996, plaintiff phoned Ms. Hoell and cancelled the meeting indicating that he did not feel any need for vocational rehabilitation services. Ms. Hoell wrote Dr. Charron on 26 January 1996 requesting information concerning plaintiff's ability to work.
43. Plaintiff returned to Dr. Towne on 30 January 1996.
44. In January, 1996, plaintiff cancelled the meeting with Ms. Hoell which was arranged for 6 February 1996 saying that he had to undergo additional testing by Dr. Towne.
45. Dr. Charron wrote another letter on 6 February 1996 advising that plaintiff had reached maximum medical improvement and could return to work.
46. On 7 February 1996, Ms. Hoell continued to arrange job search meetings. Plaintiff did not attend these meetings.
47. On 21 February 1996, Dr. Towne wrote that he recommended a work hardening program.
48. On 7 March 1996, it was arranged that plaintiff could reenter physical therapy. The physical therapist indicated that it was impossible to fully assess plaintiff's level of function because of submaximal effort relating to the tests.
49. Dr. Charron approved a dispatcher position with defendant-employer.
50. On 9 April 1996, plaintiff returned to Dr. Towne. Dr. Towne did not believe that plaintiff was able to sustain gainful employment. A Form 24 application requesting permission to terminate compensation was filed and an informal hearing was heard on 14 November 1996. Special Deputy Commissioner Amy Pfeiffer entered an Order requiring that plaintiff reasonably participate in the efforts to return to suitable, gainful employment.
51. Again, defendants requested that CRA provide rehabilitation services to plaintiff. Denise Barnhardt of CRA was assigned plaintiff's case. Ms. Barnhardt contacted plaintiff by telephone on 31 December 1996, and plaintiff informed her that he was unable to work. Ms. Barhardt reminded plaintiff that his treating physician, Dr. Charron, had released him to return to work, and attempted to scheduled a job search meeting. By letter dated 3 January 1997, plaintiff again indicated that he was unable to work. By letter dated 17 January 1997, plaintiff advised Ms. Barnhardt and the Industrial Commission that he would not participate in efforts to locate employment for him. He reiterated this stance to Ms. Barnhardt by telephone on 21 January 1997.
52. The issue of plaintiff's failure to cooperate with vocational rehabilitation was brought before Deputy Commissioner Jones at a hearing held on 24 February 1997. Deputy Commissioner Jones denied defendants' motion to suspend plaintiff's benefits, and ruled that plaintiff had not reached maximum medical improvement and that he would benefit from continued medical treatment. To that end, it was ordered that Dr. Gilbert Snider of Chesapeake, Virginia, be designated as plaintiff's treating physician, and that plaintiff "use all good faith efforts to comply with the medical treatment provided by Dr. Snider." In addition, Dr. Snider was instructed to do a complete workup in order to determine plaintiff's current status.
53. Plaintiff was examined by Dr. Snider on 11 September 1997. Dr. Snider diagnosed plaintiff with chronic low back pain, with no reliable evidence of neurological examination of radiculopathy. Dr. Snider further indicated that plaintiff had been through all available therapies and that Dr. Snider did not foresee plaintiff having further improvement.
54. On 20 October 1997, plaintiff underwent a Functional Capacity Evaluation. Dr. Snider indicated that plaintiff could not work an eight-hour day, but was capable of working four hours per day with restrictions. Dr. Snider further stated that it was impossible to objectively qualify how much plaintiff was capable of doing.
55. On 6 November 1997, plaintiff wrote to Deputy Commissioner Jones requesting to have Dr. Albert Towne designated as his treating physician. By Order dated 19 November 1997, plaintiff's request was denied.
56. In January 1998, Dr. Snider confirmed that he was plaintiff's treating physician, but he noted that plaintiff had repeatedly and in no uncertain terms expressed his dissatisfaction with Dr. Snider and his desire to have Dr. Snider removed as his treating physician.
57. On 21 January 1998, plaintiff filed a motion to change his treating physician. By Order dated 11 February 1998, Deputy Commissioner Jones again denied defendants' motion to terminate or suspend plaintiff's benefits, and designated Dr. Robert Hanson as plaintiff's new treating physician. Further, Deputy Commissioner Jones noted that plaintiff's failure to comply with Dr. Hanson's treatment would result in the termination of compensation.
58. Plaintiff presented to Dr. Hanson on 3 March 1998. Dr. Hanson received plaintiff's medical history as told by plaintiff. Dr. Hanson's impression was that plaintiff had long standing back problems with mechanical back pain. He also noted a possible underlying sleep disorder which would aggravate chronic pain. He did not believe additional surgery would be helpful, and he outlined a plan to start plaintiff on a pain management regimen, including medication.
59. Plaintiff's next visit was on 12 March 1998. Dr. Hanson's exam revealed that plaintiff was overweight and very uncomfortable. His spinal range of motion was limited in all directions. He walked slowly, and his arm and leg strength were normal. Plaintiff's sensory examination was noted to be entirely inconsistent, and plaintiff's claims did not match his physical reactions. Again, Dr. Hanson recommended a chronic pain management program, along with review by spine surgeon, Dr. Kerner. He also recommended a neuropsychological evaluation "to quantitate the extent of personality intrusion." The visit with Dr. Kerner was scheduled for 3 April 1998, and the neuropsychological assessment with Dr. Schlegel on 9 April 1998.
60. On 27 April 1998, Dr. Hanson noted that plaintiff wrote him a 9 page letter correcting history errors contained in previous office notes prepared by Dr. Hanson. In the letter, plaintiff refused to pursue the recommended tests until the inaccuracies were corrected. By return correspondence, Dr. Hanson acquiesced to plaintiff's version of his medical history and believed the problems to be corrected; however he noted that the scheduled tests had not been held, and that they needed to be rescheduled.
61. On 30 April 1998, plaintiff sent a letter to Dr. Hanson in which he refused to participate in Hanson's treatment program until Hanson answered five questions to plaintiff's satisfaction regarding statements in prior office notes. Hanson answered, noting some concern in plaintiff's adversarial tone and in his inordinate attention to the minutia of the notes. Further, Dr. Hanson noted that he had a problem with plaintiff's repeatedly calling his office and threatening not to comply with treatment as "bargaining chips" to get the results he wanted.
62. Dr. Hanson's office notes from 13 May 1998, contain the results of an Electromyographic exam which showed plaintiff's nerve conduction was normal. Following an office visit on 26 May 1998 wherein there was no noted change in plaintiff's condition, Dr. Hanson recommended an MRI to see if there was a recurrent disc herniation.
63. The MRI was performed on 1 June 1998. No definite nerve root entrapment was evident at L5-S1 or at L4-L5; however there was some mild diffuse disc bulging at L3-4. The results suggested to Dr. Hanson a disc protrusion with possibly some epidural scar and granulation tissue or even a free disc fragment. Dr. Hanson believed there was possible L3-4 post operative changes, but required clinical correlation.
64. Plaintiff returned to Dr. Hanson on 16 June 1998, with symptoms unchanged. Dr. Hanson still believed plaintiff suffered from chronic lumbar radiculopathies and chronic mechanical low back pain, and he still recommended an exam by a spine surgeon, and neuropsychological testing due to plaintiff's emotional distress associated with chronic pain.
65. Plaintiff did not return to see Dr. Hanson until 30 November 1998. At that time, plaintiff by his own admission only returned to get his medications refilled, as defendants would only reimburse him for visits to Dr. Hanson. Since his last visit in June, plaintiff had been seeing Dr. Carr in Richmond, Virginia, a physician of plaintiff's own choosing.
66. Plaintiff's next contact with Dr. Hanson came by telephone on 9 March 1999, when plaintiff again sought a refill of his medications. Dr. Hanson refused to do so without an office examination and plaintiff declined, stating that he would just get the medications from Dr. Carr.
67. On 9 April 1999, Denise Burkhardt scheduled an appointment with plaintiff to see Dr. Hanson. The meeting occurred on 23 April 1999. Burkhardt reiterated to plaintiff that Dr. Hanson was his treating physician. Dr. Hanson diagnosed plaintiff with myofascial pain syndrome, and opined that plaintiff had reached maximum medical improvement. He believed that there would be no cure for plaintiff's problem, although he felt it might be treated with medication to some extent. Dr. Hanson described the meeting as "very contentious." Plaintiff complained about how his case was being managed and about Hanson's treatment. Hanson believed plaintiff could be retrained to do sedentary work, and wanted him to undergo another FCE in order to create a new vocational rehabilitation plan. Plaintiff refused, wanting to do it somewhere other than where Dr. Hanson recommended. Dr. Hanson recommended that plaintiff appeal the decision. As of this time, plaintiff has not done so. Plaintiff has not returned to Dr. Hanson since this visit.
68. As of 30 November 1998, plaintiff admittedly and unjustifiably refused to comply with the treatment instructions of his then designated treating physician. Further, plaintiff has admittedly and unjustifiably refused to comply with the vocational rehabilitation programs offered by defendants. Both of these refusals are in direct contravention of the Order of Special Deputy Commissioner Amy Pfeiffer, the 15 July 1997 Opinion and Award of Deputy Commissioner Bain Jones, and the 11 February 1998 order of Deputy Commissioner Jones.
***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. The treatment and care provided by Drs. Robert Hanson, Gilbert Snider, and Alan Towne have been of benefit to plaintiff. Accordingly, plaintiff is entitled to medical compensation for the cost of that treatment. There is no evidence that plaintiff is entitled to medical compensation for treatment provided by any other physician he has seen after the entry of the 11 February 1998 Order which designated Dr. Hanson as plaintiff's treating physician unless specifically referred to that physician by Dr. Hanson for reasons related to his compensable injury. N.C. Gen. Stat. § 97-25.
2. Plaintiff has, by his own admission, failed to use good faith efforts to comply with the treatment instructions of Dr. Hanson, or to comply with vocational rehabilitation efforts designed to return him to the work force, both as directly ordered by the Commission. Accordingly, plaintiff is no longer eligible to receive compensation benefits, from 30 November 1998 onward. N.C. Gen. Stat. § 97-27.
3. The suspension of plaintiff's benefits shall continue until, in the opinion of the Executive Secretary, Tracey Weaver, plaintiff's refusal to comply with vocational rehabilitation efforts and with the treatment of Dr. Hanson has ceased. N.C. Gen. Stat. § 97-27.
4. Defendants are entitled to reimbursement of any and all compensation amounts which have been paid to plaintiff since 30 November 1998, as these amounts were not due and payable under the Act when made. N.C. Gen. Stat. § 97-42.
***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's compensatory benefits are suspended as of 30 November 1998, and continue to be suspended until plaintiff complies with vocational rehabilitation efforts offered by defendants, and with the treatment of Dr. Hanson, or a physician designated by Dr. Hanson as a treating physician.
2. Defendants shall pay all of the medical expenses incurred by plaintiff as a result of his compensable injury including the bills from Dr. Robert Hanson, Dr. Alan Towne, and Dr. Gilbert Snider.
3. Defendants shall receive a credit for the amounts paid to plaintiff in compensation benefits since the date of the suspension of those benefits, 30 November 1998.
4. Defendants shall pay the costs.
This 28th day of August, 1999.
S/_____________ THOMAS J. BOLCH COMMISSIONER
CONCURRING:
S/_____________ DIANNE C. SELLERS COMMISSIONER
S/_____________ CHRISTOPHER SCOTT COMMISSIONER